El Pueblo, Demandante y Apelado, *v.* Valdés, Acusado y Apelante.

Apelación procedente de la Corte de Distrito de Guayama en causa sobre daños maliciosos.

No. 885.—Resueto en abril 14, 1916.

Daños Maliciosos—Malicia—Animales—Penetración en Propiedad Ajena—Acto Criminal.—Cualquiera que sea la clase o grado de malicia necesaria para constituir el delito de daños maliciosos de acuerdo con el artículo 514 del Código Penal, su existencia siempre puede negarse mediante prueba adecuada de que otros han sido los motivos, y el motivo por el cual una persona mata o causa daño a un animal que penetre en la propiedad ajena es el medio que hay que probar para la criminalidad del acto.

Id.—Animales—Penetración en Propiedad Ajena—Malicia.—El solo y simple hecho de penetrar un animal en una propiedad ajena causando algún ligero daño en ella, sin estar acompañado de algún otro hecho, no es por sí suficiente para negar la demostración *prima facie* de malicia.

Id.—Animales—Destrucción de Propiedad—Derecho de Propiedad.—Cuando la prueba demuestra que los animales estaban constantemente penetrando en la propiedad donde por fin fueron muertos; que estaban destruyendo siembras por valor mayor al de dichos animales; que por un lado se sacaban y por otro entraban inmediatamente; que al dueño de los mismos repetidas veces se le llamó la atención para que los sacara de la propiedad, contestando que no eran los suyos, que los mataran, siendo el acto de dar muerte a dichos animales necesario para proteger el derecho de propiedad, no existe el delito de daños maliciosos.

Id.—Ordenanzas Municipales—Animales Realengos—Presunción de Ordenanza—Conocimiento Judicial.—Cuando en una denuncia por haber dado muerte a un animal no consta en manera alguna de los autos que fuera promovida o considerada en forma alguna por la corte *a quo* la cuestión de si existiendo en los municipios ordenanzas sobre animales realengos que castigan con multa a sus dueños, el acusado debió haber apresado y encerrado el animal en vez de darle muerte, la Corte Suprema no puede presumir la existencia de dichas ordenanzas, aun cuando al juzgar al acusado la corte inferior hubiera tomado conocimiento judicial de las mismas.

Id.—Malicia—Órdenes del Principal—Absolución del Acusado.—Cuando el acusado actúa sin malicia alguna al dar muerte al animal y con el solo propósito de defender la propiedad bajo su cuidado, cumpliendo órdenes expresas de su principal dadas después de haberse agotado sin resultado todos los medios razonables para proteger las cosechas nacientes y solamente cuando ya la paciencia dejaba de ser una virtud, él debe ser absuelto.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. José C. Ramos.*

Abogado del apelado: *Sr. Salvador Mestre, Fiscal.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

El acusado y apelante fué declarado culpable por un delito de daños maliciosos de acuerdo con el artículo 514 del Código Penal, el cual es como sigue:

"Artículo 514.—Todo el que maliciosamente matare, estropeare o hiriere algún animal perteneciente a otro, o que maliciosa y cruelmente golpeare, torturare o lastimare cualquier animal, suyo o ajeno, incurrirá en *misdemeanor.*"

La prueba testifical en tanto tiende a demostrar la existencia o no de malicia, que es la única cuestión envuelta en este caso, es en substancia como sigue:

Rogelio Pérez, que fué quien formuló la denuncia, declara que estando el denunciante en el patio de su casa, en ocasión en que miraba hacia el oeste, vió al acusado que hacía fuego con una escopeta y figurándose que dicho acusado había tirado a alguno de sus cabros corrió hacia el sitio de la ocurrencia. Al llegar allí el acusado dijo: "Yo maté los cabros porque estaban en la propiedad y tengo órdenes de Don Domingo Mundo, dueño de la' propiedad, de que cuanto cabro se presente aquí lo mate." "Esos cabros los teníamos achicados en la orilla del río; pero parece que la cabra rompió la soga y se soltó y al pasar por la guardarraya de la finca del Sr. Mundo y el río el acusado les tiró y los mató. En el sitio donde los cabros fueron muertos no había siembras." Repreguntado por el abogado defensor, contestó, "que vió al acusado cuando hizo fuego pero no veía el sitio en donde se encontraban los cabros en ese momento porque quedaba el sitio en donde éstos se encontraban en sentido opuesto. Que tenía los cabros amarrados en el río. Que se trata de una cabra con su cría y que solamente sabe que la cabra la amarró y se soltó y vió al acusado cuando disparó un tiro sin saber el denunciante en qué sitio estaba la cabra, y luego, al ir, vió que la cabra estaba muerta en la guardarraya."

Maximiliano Castro declara "que el día de autos, encon-

trándose en el río, sintió un disparo y entonces se dirigió hacia donde había sentido el tiro y vió allí una cabra con su cría muertas; la cabra estaba en la parte afuera de la palizada y el cabrito en la parte adentro de la finca de Don Domingo Mundo, cerca de la palizada. Casi en los momentos en que el exponente había llegado al sitio, llegó el acusado que era guarda de Don Domingo Mundo y dijo que él era quien había matado la cabra con su cría.'' Repreguntado por el abogado defensor dijo ''que oyó solamente un disparo y que se encontraba al lado del sitio del suceso. Que en el sitio en que encontró muerto al cabrito había caña sembrada.'' Repreguntado por el juez contestó ''que la palizada estaba en la guardarraya del Sr. Mundo, es de alambre, de dos o tres pelos. Que la cabra podía pasar por debajo de esos alambres.'' Repreguntado nuevamente por el Fiscal, contestó ''que el cabrito tendría dos o tres meses, y que la cabra llevaba un pedazo de soga colgando.''

Rafael C. Atilano declara ''que el día a que se refiere la denuncia estaba el deponente cerca del acusado, como a cien metros de distancia y vió una cabra con su cría que subía una cuestecita y al momento al acusado que disparó un tiro y los mató; siendo los animales propiedad de Rogelio Pérez.''

Por la defensa declara Domingo Mundo ''que conoce al acusado Bartolo Valdés quien durante el mes de mayo del año pasado 1913, desempeñaba la ocupación de guarda de la colonia del exponente. Que el día a que se refiere la denuncia salió el declarante a voltear su colonia como de costumbre, y al pasar por el río frente a la pieza de cañas denominada 'El Cementerio' vió en ella la cabra con su cría. Que entonces se dirigió a la casa de un agregado en busca del ganado y le interrogó por él. Que el agregado le contestó: 'Ahora mismo va por ahí y va a ver unos cabros que están en la pieza del cementerio.' Que se fué el declarante y vió que efectivamente el guarda entraba a la pieza de cañas e hizo un disparo; entonces vió el deponente una cabra que saltaba por la barranca y caía a la orilla del río y que el ca-

brito quedó muerto en el mismo sitio. Que en su propiedad
penetraban esos cabros siempre, continuamente, por un lado
se sacaban y por otro entraban porque el denunciante no
tenía pastos para esos cabros; de noche los tenía en su casa
y de día los ponía en la orilla del río en un pedregal donde
no hay yerba y, naturalmente, la pieza de cañas que estaba
como lechugas pues se le echaba agua del riego, esos cabros
iban y se metían allí y la destrozaban. Varias veces el depo-
nente llamó la atención al denunciante acerca del daño que
le estaban haciendo los cabros y respondía: 'Esos cabros
no son míos; si se los encuentra ahí, máteles; que ya digo,
no son míos.' Entonces pensé: ''para salvar y proteger mi
caña es preciso matar esos cabros; si no son de nadie serán
míos, y dí órdenes al guarda para que los matara con objeto
de proteger mi plantación, ya que los cabros no valen en com-
paración con los cientos de pesos que cuesta la caña y teniendo
en cuenta que el cabro a la vez que pone la boca en una mata
de caña ésta se muere. El río ese de que se ha hablado no
tiene agua, sólo que tiene el cauce que cruza por mi propie-
dad y yo lo colindo por ambos lados.'' Repreguntado por el
Fiscal contestó ''que se hallaba a una cuerda de distancia del
sitio en donde se encontraban los cabros y que podía ver per-
fectamente pues la caña estaba pequeña. Que la cabra fué la
que cayó al río y que el cabrito fué el que quedó muerto en el
sitio. Que el deponente estaba ya cansado de ir donde el
denunciante y le decía 'mire que los cabros me están destro-
zando la caña y esas plantaciones me cuestan muchísimo di-
nero; el cabro come la caña y ésa se muere.' Me decía 'pues
no son míos; mis cabros están amarrados.' '' Que todas las
demás personas que por allí tienen cabros los tienen amarra-
dos y algunas de ellas cuando se les sueltan los cogen seguido.
Que los cabros venían por la orilla del río y venían comiendo
los surcos de caña. Que la cerca es de dos pelos de alambre y
no puede poner más porque cuando crece el río se la lleva.
Que lo corriente en el campo es poner dos o tres pelos de
alambre.''

Antonio Patiño declara ''que el día después de haberse matado la cabra a que se refiere la denuncia, fué llamado el testigo en su calidad de policía insular para que fuera a ver unos daños que dichos animales habían hecho en la propiedad de Domingo Mundo. Que entraron al sitio y el deponente vió una mata de caña que se conocía que la había comido un cabro u otro animal, y al lado había una mancha de sangre.'' Repreguntado por el Fiscal contestó ''que solamente había una matita tronchada en la cepa. Que las otras matitas tronchadas se conocía que lo habían sido de viejo pues ya estaban las puntas secas.''

Bartolo Valdés, el acusado, declara ''que el día a que se refiere la denuncia estaba en la casa del Sr. Carlos Soliveras conversando con él y al mismo tiempo le gritó su señora de la otra parte del río: 'Bartolo, mira los cabros que están en la pieza de cañas.' Seguido corrió el acusado y se dirigió a la pieza de cañas y vió los cabros metidos allí; al mismo tiempo que estaba haciendo la puntería con la escopeta se presentó su principal Don Domingo Mundo y entonces el acusado disparó y de un solo tiro mató los dos cabros que estaban en la pieza de cañas; la grande con las ansias de la muerte se fué por la barranca y el chiquito quedó en el mismo sitio. Que allí no se encontraban ni Maximiliano Castro, Rafael Atilano ni el denunciante. Ellos penetraron por dentro de la finca de Atilano banco sobre banco cruzando por dentro de la finca a salir al sitio donde el acusado mató los cabros. Estos cabros habían muchas veces penetrado en la finca y hecho daño. Se cansó de avisarle al dueño de ellos que era la madre del denunciante. Que llevaba tres meses en la colocación y casi todos los días decía a dicha señora: ''Doña Carolina, asegure los cabros que están haciendo daño en la finca de Don Domingo Mundo,'' ella le contestaba, ''Yo no tengo cabros ningunos y si los encuentra en la pieza de cañas, mátelos.'' Que aquel día él venía y encontró los cabros de Doña Carolina en la pieza de caña y los mató porque tenía órdenes para ello de Don Domingo Mundo.''

De acuerdo con los hechos así probados podemos prescindir al empezar de toda cuestión relativa a la responsabilidad civil por el acto reconocido por el acusado, por injustificado e inexcusable que pueda ser si se le considera como un mero daño, así como también de la cuestión de si es necesaria la malicia real para cometer el delito o si es suficiente la malicia que se infiere de las circunstancias, y *a fortiori,* la otra cuestión de si en uno u otro caso esa malicia debe dirigirse contra el dueño de la finca a que se ha causado el daño, o si será bastante la malicia contra la propiedad misma. 8 R. C. L. 299, secciones 323 *et seq;* 3 C. J. 166, secciones 545 y siguientes; Bishop sobre Delitos Estatutorios, p. 388, secciones 432*e* y siguientes; 19 L. R. A. (N. S.) 273, nota al caso, 32 Am. Dec. 662, nota.

Cualquiera que sea la clase o grado de malicia necesaria para constituir el delito, su existencia siempre puede negarse mediante prueba adecuada de que otros han sido los motivos y "el motivo por el cual una persona mata o causa daño a un animal que penetra en la propiedad ajena es el medio que hay para probar la criminalidad del acto." 1 Wharton, Ley Criminal, página 205, sección 159, II *id.* p. 1535, sección 1322, p. 1551, sección 1345; Bishop, Delitos Estatutorios, p. 392, sección 437, 8 R. C. L. sección 327.

La mayoría, si no todos los casos que están en conflicto, pueden ser reconciliados en gran parte en tanto se trata del verdadero principio fundamental si los hechos envueltos en cada caso en particular se consideran cuidadosamente teniendo en cuenta la regla citada últimamente.

Así, pues, en el caso de *Snap and Francis* v. *People,* 19 Ill. 80, que ha sido citado por el Fiscal y tal vez con más frecuencia que ninguno de los demás a que se ha hecho referencia, como uno que sostiene la proposición que con demasiada liberalidad ha sido enunciada de que "el causar daño o herir animales que penetran en propiedades ajenas no puede estar justificado por la razón de que estaban causando daño enton-

ces,'' 8 R. C. L. p. 303, sección 327, encontramos que toda la prueba en el caso la corte la condensa en dos frases cortas, a saber:

"La prueba mostró que Snap, por orden de Francis, disparó a la yegua con perdigones causándole una herida en el costado, de la cual mejoró. Al ocurrir el hecho la yegua había penetrado en un campo de avena perteneciente a uno de los apelantes el que estaba protegido por una palizada que no era muy buena."

No existe la más remota indicación de que la yegua hubiera penetrado alguna vez antes en la propiedad ajena, o que hubiera razón para suponer que el hecho se repetiría, así como tampoco de ninguna circunstancia que demuestre que el acto del acusado fuera necesario de algún modo para proteger la propiedad. Por el contrario, el empleo de perdigones sugiere el espíritu de una extremada crueldad, perversidad, hostilidad y venganza, y los hechos deficientes que revela la decisión según han sido publicados, en ausencia absoluta de circunstancias atenuantes fuera de la transgresión misma "demuestran una mente lista y dispuesta a la comisión de un daño," en vez de un propósito honrado por parte del acusado de defender sus nacientes cosechas contra los destrozos de un animal que constantemente está destruyendo, o vicioso, valiéndose el acusado del único medio adecuado y eficaz de acabar con tal molestia. Por tanto, difícilmente puede ser interpretado el caso como uno en el cual no se establece otra cosa que la proposición de que el solo y simple hecho de penetrar un animal en una propiedad ajena, causando algún ligero daño a dicha propiedad sin estar acompañado de algún otro hecho, no es por sí suficiente para negar la demostración *prima facie* de malicia. Véase también a *State* v. *Grimes,* 13 S. W. 955.

En el caso de *State* v. *Murphy,* 68 S. E. 570, la corte se expresó como sigue:

"Hubo prueba de que el acusado había sido molestado por los cerdos de sus vecinos que penetraban en su propiedad y de que les había dado aviso de sacarlos. Declaró el denunciante que el acusado

le había dicho algunos días antes de haber disparado al cerdo que iba para allá con su escopeta a disparar a todo lo que encontrara allí; que iba a disparar a los cerdos; a matar cualquier cosa maldita que llegara allí. El acusado reconoció haber matado el cerdo.''

Las excepciones impugnaban la resolución de la corte sentenciadora entre otras razones por ''negarse a conceder un nuevo juicio después de haber instruído al jurado que era una buena defensa a la acusación el probar que se mató al animal mientras penetraba en el recinto del acusado, y con el fin de impedir la destrucción de su propiedad, cuando la prueba mostraba que ésas eran las circunstancias por las cuales se dió muerte al cerdo,'' y la corte, refiriéndose a esta cuestión, dijo lo siguiente:

''Sin expresar ninguna opinión en cuanto a la corrección de la instrucción de que era una buena defensa a la acusación probar que se mató al animal mientras penetraba en el recinto del acusado, y con el fin de impedir la destrucción de su propiedad, como no está ante la corte la cuestión relativa a la corrección de esa proposición, no vemos que exista error en negar el nuevo juicio después de la instrucción así dada por la corte, porque evidentemente que el jurado encontró probado que la protección de la propiedad del acusado no era el único motivo que había para matar al cerdo, sino que el acto se realizó maliciosamente. Estando sostenida por la prueba esa conclusión, la resolución del juez de circuito sobre la moción de nuevo juicio no puede ser revisada por este tribunal.

''La moción de nuevo juicio se fundaba en las conclusiones de hecho del jurado que se alegó eran erróneas. En contestación, el juez manifestó que el jurado conocía a la vecindad y a la gente mejor que él, y es de presumirse que por esa razón creyó que sus conclusiones eran correctas, por lo menos, él alegó eso como una razón para negarse a modificar el veredicto. Esa fué una razón buena y suficiente.''

El caso de *Stephens* v. *State,* 8 Am. Crim. Rep. 158, en el cual acusado fué declarado culpable de crueldad con los animales, es un caso algo más análogo al caso presente por razón de los hechos:

''La prueba demuestra que los cerdos de un vecino penetraron en la propia cosecha de Stephen; que Stephen fué donde el dueño de

los cerdos quien le ayudó a sacarlos de su finca; que los cerdos volvieron a penetrar en su propiedad y que éste fué nuevamente donde el dueño de los mismos de quien solicitó ayuda para sacarlos, a lo que éste último se negó.   Entonces Stephen trató de ponerlos fuera, pero después de correr detrás de ellos por algún tiempo sin poder sacarlos, cogió su escopeta y mató varios de los mismos.   En el juicio ofreció probar que tenía la debida palizada alrededor de su propiedad, lo que no le fué permitido por la corte.   Entonces pidió a la corte que instruyera al jurado que si de la prueba aparecía que él mató los cerdos para proteger su cosecha, etc., y no guiado por un espíritu de crueldad hacia los cerdos, debía de ser absuelto.   La corte negó esta instrucción, se dictó sentencia contra él, e interpuso apelación.''

En la Corte Suprema de Mississippi, sin vacilación alguna, y creemos que correctamente, hace aplicación del principio fundamental envuelto, como sigue:

''La corte inferior incurrió en error al negarse a instruir al jurado a solicitud del apelante, en el sentido de que debían declararlo no culpable si creían, en vista de la prueba, que él mató los cerdos mientras causaban daño a su cosecha, y para evitar que fuera destruída y no impulsado por un espíritu de crueldad para con los animales.   Dicha instrucción era aplicable a la prueba y exponía la ley correctamente.   Era inmaterial el hecho de si el apelante tenía o no debidamente la palizada.   El motivo por el cual el acto fué realizado es el medio de probar si fué o no criminal.   A menos que el apelante actuara movido por un espíritu de crueldad o con un deseo de causar dolor y sufrimiento innecesario a los animales, no era culpable del delito que se le imputó.   Puede haberse extralimitado en sus derechos por lo que es responsable civilmente, pero su propósito e intención fué proteger su cosecha de la destrucción, no infringió el estatuto de acuerdo con el cual fué acusado.''

En el caso de *Hobson* v. *State,* 44 Ala. 380 (nota 128 Amer. St. Rep. 164) se resolvió que ''si en un juicio por daños maliciosos por matar un cerdo, el jurado cree que el acusado actuó de acuerdo con las instrucciones que tenía de su principal, y que él creía que tenía derecho a matar el animal en cumplimiento de dichas órdenes, y que no tenía predisposición hacia el dueño del animal, debía ser absuelto.''   Véase también a

*People* v. *Kane,* 29 N. E. 1014, 37 N. E. 104; *Brady* v. *State,* 26 S. W. 621.

En el caso de *Lott* v. *The State,* 9 Texas Ct. App., 206, el cual se menciona en 47 Amer. Rep. 310, nota, una acusación por herir ilegalmente a un cerdo, la corte se expresó en los términos siguientes:

"Creemos, sin embargo, que la corte incurrió en error al negarse a permitir al acusado probar por medio del testigo Reeves 'que el cerdo acostumbraba, y por bastante tiempo había estado penetrando en la finca del acusado, alrededor de su molino y siembras, destruyéndolos y causando gran molestia y daño al acusado; y que tan pronto como el acusado mató el cerdo, inmediatamente remitió su importe en dinero al dueño en pago del mismo. Esta prueba debió haberse sometido al jurado para que fuera tomada en consideración al resolver si se mató al animal voluntaria y aviesamente, sin excusas y bajo circunstancias que demuestran un espíritu ilegal, o si en vista de las circunstancias tales hechos negaban dichos impulsos, motivos y desenfrenos. *Branch* v. *The State,* 41 Tex. 622; *Jones* v. *The State,* 3 Tex. Ct. App. 228."

En la misma nota puede verse una relación más extensa de otro caso muy interesante, el de *Thomas* v. *State,* 14 Texas Ct. App., 220, en el que se aplica el mismo principio a hechos algo diferentes. Véase también a *Wright* v. *The State,* 76 Amer. Dec. 656; *Farmer* v. *State,* 2 S. W. 767; *State* v. *Churchill,* 98 Pac. 854.

En el presente caso la prueba no ha sido contradicha en cuanto a que el denunciante tenía sus cabras atadas, cuando así lo hacía, a la orilla de un río en un pedregal; que estaban constantemente haciendo destrozos en la finca donde por fin fueron muertas; que estaban destruyendo propiedad por valor que estaba fuera de toda comparación al de dichos animales; que por un lado se sacaban y por otro entraban inmediatamente; que tanto al dueño como a su madre, repetidas veces se le llamó la atención para que los sacaran de las cañas y a menudo contestaban que los animales que penetraban en su finca no eran sus cabras, que sus cabras estaban amarradas y hasta le dijeron al dueño del terreno sembrado de

cañas y a su guarda, el acusado, que si encontraba allí los cabros los matara. El pedazo de soga que llevaba la cabra colgando en el pescuezo es una prueba elocuente de la poca resistencia de la misma, de igual modo que las manifestaciones hechas por el acusado y su principal no solamente no han sido negadas por el dueño de las cabras, sino que por el contrario están firmemente corroboradas por su propia y franca confesión de la conclusión instantánea a que llegó al oir el disparo respecto a la verdadera identidad del blanco invisible y por la precisión inequívoca de ese ligero pensamiento intuitivo que le hizo correr, no al lugar donde habían sido amarradas las cabras, sino directamente al sitio de la matanza.

No tenemos necesidad de considerar en sus detalles la alegación que hace el Fiscal de que puesto que en todos los municipios existen ordenanzas sobre animales realengos que castigan con multa a sus dueños, el acusado debió haber apresado y encerrado las cabras en vez de dispararles, y que el hecho de resolverse a elegir este último medio indicaba malicia. No constando en absoluto en los autos que semejante cuestión hubiera sido promovida y considerada en forma alguna por cualquiera de las cortes que conocieron de la causa, no podemos suponer la existencia de dicha ordenanza, aun cuando la corte municipal, o hasta la de distrito, al juzgar el caso *de novo* hubieran tomado conocimiento judicial de la misma, de haber existido, y, por tanto, no resolvemos ahora hasta dónde hubiera podido afectar a la resolución de esta apelación tal ordenanza si de los autos hubiera aparecido que existía o que fué tenida en cuenta por la corte inferior.

Según los hechos que aparecen de los autos, el acusado actuó con el mejor propósito, sin malicia de ninguna clase, real o aparente, y con ningún otro fin que el de defender la propiedad donde estaba empleado para cuidarla, por el hecho de cumplir con las órdenes expresas de su principal dadas después de haber sido agotados sin resultado todos los medios

razonables para proteger las cosechas nacientes y solamente cuando ya la paciencia dejaba de ser una virtud.

La sentencia apelada debe ser revocada.

> *Revocada la sentencia apelada y absuelto el acusado, con las costas.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y Aldrey.

El Juez Asociado Sr. del Toro no intervino en la resolución de este caso.